In the Matter of JOHN BAPTIST MARSHALL, an Attorney,
Respondent.

First Department, February 5, 1926.

**Attorney and client — disciplinary proceedings — attorney suspended for
two years for conversion of funds of client subsequently repaid and
for negligence in failing properly to examine title and promptly to
record mortgages for loans made by him for client.**

An attorney who had practiced many years before the bar without previously
having been charged with misconduct, is suspended for two years for converting
funds of a client given to him for the purpose of paying taxes, which money
was subsequently repaid, for negligently failing to examine the title to property
on which he loaned money for a client on mortgages, and for negligently failing
promptly to record the mortgages, so that judgments were allowed to be entered
which became a lien on the property prior to the mortgages.

DISCIPLINARY proceedings instituted by the Association of the
Bar of the City of New York.

*Einar Chrystie,* for the petitioner.

*John Baptist Marshall* [*Ralph O. Willguss* of counsel], respondent
in person.

CLARKE, P. J. The respondent was admitted to practice as an
attorney and counselor at law in the State of New York in March,
1889, at a General Term of the Supreme Court of the State of New
York, First Department, and has practiced as such attorney since
his admission.

The petition charges that the respondent has been guilty of
misconduct as an attorney at law as follows:

Charge No. 1. That the respondent converted to his own use
$623.34, given to him by a client to be expended for a specific
purpose; also that the respondent falsely represented that said
moneys had been applied for the purpose given, and later offered
a sum of money to one Whelan to conceal the real situation from
respondent's clients.

Charge No. 2. That respondent received from a woman client
two sums of $1,000 each for investment on first mortgages; that he
placed both sums on the same piece of property secured by two
separate mortgages and that he failed to examine the title when he
recorded the first of the mortgages and that he failed to record the
second mortgage for a period of almost ten months, during which
time additional judgments were filed which became prior liens on
the property, all of which resulted in loss to his client.

As to the first charge respondent in effect admits that he con-

verted the money but denies that he misrepresented the facts to Mr. Whelan or that he offered him a bribe. The respondent was the attorney for the Calvary Baptist Church. The church agreed to loan to Mrs. Whelan, the owner of the premises 86 Dean street, Brooklyn, N. Y., the sum of $7,500. The transaction was closed on July 18, 1922. The proceeds of the new mortgage were insufficient to pay the expenses and outstanding liens on the property and the owner advanced the further sum of $311.59, for the purpose of paying all these liens. The sum of $623.34 was delivered to the respondent to be used by him solely for the purpose of paying taxes and water rates due on the property. In September or October, 1922, the owner of the Dean street property negotiated a second mortgage thereon and her husband, Mr. Whelan, was then informed by the person who had agreed to make the loan that the taxes which the respondent had agreed to pay with the money given to him were still on record as liens against the property. Mr. Whelan, who conducted the negotiations for his wife, then called upon the respondent and asked him about the tax bills. The respondent promised to get them out in a day or two but he did not do so. Mr. Whelan testified that he called on respondent at least twenty times thereafter in regard to the bills and that he received various excuses but that the bills did not arrive. Among the excuses given was the fact that the respondent had moved and that his effects were mixed up and that he did not know just where to lay his hands on the bills. In February, 1923, Whelan notified the Calvary Baptist Church of the respondent's failure to pay the taxes and the matter was then taken up by another attorney in behalf of the church authorities with the result that the taxes were paid in April, 1923. When the respondent received the money in July, 1922, he used $411.59 thereof for the purpose of opening a bank account in his own name in the Bigelow State Bank. The transcript of this account shows that he immediately began to withdraw funds by means of checks for small amounts and that on October second the balance to his credit was only $2.80. The respondent admitted that he used the money to pay personal bills which were pressing. He testified himself: " I received that money. I found between Saturday and the time I received it I had not enough. I had made payments that were pressing me in connection with my relations to the Pastor of the church. There were two or three people that were pressing me for money. One party told me that he was afraid that Dr. Stratton would ask him or some of his friends would ask him, if I owed him money and he wished me to pay it as soon as possible, and I told him that I expected a fee at that time. I hurried and paid it out of this money — the tax money. There

was a lady in the church that had loaned a colored church some money. Dr. Stratton had got hold of her and told her that I was dishonest, that she would not see her money probably."

The referee interposed: " Mr. Marshall, you know there is no excuse for your appropriation of the money for the purpose of paying your own pressing debts. That is all there is to it."

Respondent: " I sent some of the money to this lady on account of interest. Some of this very money. I did pay the money out for those things which were my own affairs. There is no question about it, they were pressing me. I found myself deprived of some income I expected through my antagonism with the pastor of the church. When I met Mr. Whelan, I told him I would send him the receipts. I never told him an untruth about it. He came to me early in October and told me the taxes were not paid. I never said that I had paid the taxes. He is mistaken about that. He may have gotten the idea from what I did say, that I said I paid them, but I was careful not to tell an untruth about it. I was in a hard situation and I wanted to put him off, hoping that I would get the money. I told Mr. Whelan from the first interview with him, which was early in October, that I did not want the church people to know anything about it, that I was having trouble with the pastor of the church. I did propose at one time to pay him half the amount. It was not as a bribe. I did say to him once: 'Anything this costs you by reason of my default I will make good, besides paying the tax bills.' But I did beg him many times never to go to the church people with it and he held off as long as he thought it was prudent."

The learned referee states in his report that the respondent applied to his own use money given to him by a client for a specific purpose, retaining the same for a period of about nine months. No other conclusion could be reached upon the evidence.

The record discloses the improper use of trust funds delivered to a member of the bar for a specific purpose and his yielding to the temptation to use them to meet his own pressing necessities. The record, as we have examined it, convinces us that the respondent did carefully and designedly conceal for many months from his clients the fact that he used this money for his own purposes, and deliberately caused them to believe that the tax bills had been paid by him. Ultimately, he did pay said bills and that fact may be taken into consideration in determining the penalty to be meted out for the proved and admitted breach of his professional obligations.

As to the second charge, the learned official referee reports that the respondent in relying upon the word of others instead of

promptly searching the title, as well as in failing immediately to record the mortgages referred to, was careless and negligent of his client's interest. He also found that there was no evidence of any corrupt motive on respondent's part by reason of loaning his client's money on insufficient security.. The respondent received from his client, a woman upwards of seventy years of age, the sum of $1,037.54, and he gave her a receipt therefor, stating that "$1,000 of this sum is to be placed as a loan on a certain lot of land in White Plains, N. Y., known as Lot No. 29, on a certain map known as map of Vivian Heights, &c., filed in the office of the Register of Westchester County on June 20, 1905, as Map No. 1158, to be secured by a first mortgage on said lot bearing interest at six per cent per annum payable semi-annually. Thirty-seven dollars and fifty-four cents to be returned by me."

On the same day he entered into an agreement with Fraade & Fraade, Inc., as follows:

"NEW YORK, *January* 6, 1912.

"Fraade & Fraade hereby apply for a loan of one thousand dollars for three years at 6% to be secured by a first mortgage, with bond of owner, on Lot No. 29, as shown on a map entitled &c. John B. Marshall hereby agrees to make such loan for his client, Isabella A. Rockwell, subject to title being found good; one hundred dollars to be paid to said Marshall to cover all charges for commissions, searches and fees for examination."

On January 9, 1912, Fraade & Fraade executed a bond and mortgage covering a vacant lot known as lot No. 29 on a map of Vivian Heights and delivered it to the respondent. The respondent did not record this mortgage until January 12, 1912, on which day he received the further sum of five dollars from his client, for which he gave her a receipt of which the following is a copy:

"*January* 12, 1912.

"Received from Isabella A. Rockwell five dollars paid by me for recording tax and mortgage of Fraade & Fraade."

In the meantime and on January 9, 1912, a judgment recovered against Fraade & Fraade was docketed in the office of the clerk of Westchester county. This judgment was for $336.92 and was unsatisfied of record and a lien against the property mortgaged by Fraade & Fraade to Mrs. Rockwell for many years subsequent to the time when the mortgage was recorded. On January 24, 1912, Mrs. Rockwell delivered to the respondent a bond and mortgage for $1,000 made by John J. Moffatt and wife on some property in the State of New Jersey. The respondent then gave his client a receipt for this bond and mortgage as follows:

" Received from Isabella A. Rockwell, bond and mortgage for $1000., made by John J. Moffatt and wife on property in Tenafly, N. J., and an assignment of same for which Mrs. Rockwell is to receive one thousand dollars or a first mortgage for that amount on property in White Plains,— bearing 6% interest per annum — also $15. interest due on said Tenafly mortgage."

The respondent collected the proceeds of this mortgage and loaned it to Fraade & Fraade, Inc., accepting as security therefor another mortgage for $1,000 on the same lot No. 29, which was covered by the mortgage for $1,000 executed on January ninth as above stated. This second mortgage for $1,000 was executed on January 29, 1912, but respondent failed to record this mortgage until December 9, 1912. In the meantime judgments against Fraade & Fraade, Inc., in addition to the first judgment above referred to were from time to time docketed in the office of the clerk of Westchester county. On April 2, 1912, a judgment for $142.56, another for the sum of $132.43 on the same day; another on November 16, 1912, for $614.17. These judgments were all liens on the property at the time the second mortgage was recorded. The respondent admits that the facts presented are substantially true and that he was negligent in the matter.

Mrs. Rockwell subsequently retained the services of another attorney who tried to recover the moneys invested for her and who on January 9, 1917, notified the respondent that the best offer he was able to obtain for the mortgages was $500, and that this offer would be accepted unless the respondent would take care of the matter. The attorney received no response to this notification and thereafter the mortgage was disposed of for $500.

The respondent admits that in the summer of 1912 he knew that Fraade & Fraade were in difficulties and that although he had not recorded the mortgage he took no steps to record it after receiving this information. The learned referee as to this charge reports in his opinion that the respondent in relying upon the word of others instead of promptly searching the title, as well as in failing immediately to record the mortgages referred to, was careless and negligent of his client's interests. He further found that there is no evidence of any corrupt motive on respondent's part by reason of loaning his client's money on insufficient security.

We are of the opinion that the respondent has been guilty of misconduct as an attorney; that both of the charges have been sustained by the evidence. It appears by the record that he is sixty-two years of age; that no other charges have ever been made against him and that letters by members of the profession have certified to his general good character. We cannot overlook such

derelictions of duty by a mature attorney. Improper and unlawful use of trust funds committed to his care and professional negligence directly leading to loss of funds by a confiding client are serious offenses. Taking into consideration the frank admissions of the respondent upon the stand, we are of opinion that the ends of justice would be accomplished by suspending him for two years, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions to be incorporated in the order to be entered hereon.

DOWLING, MERRELL, MCAVOY and BURR, JJ., concur.

Respondent suspended for two years, with leave to apply for reinstatement as indicated in opinion. Settle order on notice.